Marilyn **WHEELER**, Plaintiff-Appellee,

v.

Main **HURDMAN**, Defendant-Appellant.

No. 85–2601.

United States Court of Appeals, Tenth Circuit.

July 27, 1987.

Tim Correll (Mark P. Field, with him, on brief), The Correll Law Offices, P.C., Denver, Colo., for plaintiff-appellee.

Jacques M. Wood, Berkman Ruslander Pohl Lieber & Engel (Jim Clark, Baker & Hostetler, George W. Mueller, Burns, Wall, Smith & Mueller, with him, on briefs), Denver, Colo., for defendant-appellant.

Vella M. Fink (Johnny J. Butler and Gwendolyn Young Reams, with her on briefs), Washington, D.C., for amicus curiae E.E.O.C.

Before BARRETT, LOGAN and ANDERSON, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

This appeal pursuant to 28 U.S.C. § 1292(b) presents a single substantive issue: whether federal antidiscrimination laws protecting employees applied to the plaintiff, Marilyn Wheeler, during the time she was a general partner of the accounting firm of Main Hurdman, a general partnership.

Marilyn Wheeler, a certified public accountant, was employed as an accountant by Main Hurdman, in progressively responsible positions, for nine years, following which she was made a partner in the firm. Seventeen months later, at age forty-seven, she was expelled from the firm. She sued Main Hurdman alleging that the partnership discriminated against her in compensation and work assignments, and expelled her because of her age or sex, in violation of: Title VII of the Civil Rights Act of 1964, ("Title VII") 42 U.S.C. §§ 2000e to 2000e–17; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634; and the Equal Pay Act of 1963, 29 U.S.C. §§ 206(d), a subpart of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201–219.[1]

Main Hurdman moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b) and 12(h)(3), for want of subject matter jurisdiction. It alleged that Wheeler's complaint did not state a claim under Title VII, the ADEA, or the Equal Pay Act "because as a partner of the Firm she was not an employee" within the definitions of those Acts. The motion was treated as one for summary judgment by the district court because affidavits were submitted, and was denied. In its order denying the motion the district court concluded that although a partner, Wheeler was also an employee for purposes of each of the Acts. It stated that it was bound by *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961), to apply an "economic realities" test which, in turn, dictated the conclusion reached. The court then certified the question of coverage of the Acts for immediate appeal pursuant to 28 U.S.C. § 1292(b), as a controlling question of law as to which there is substantial ground for difference of opinion.[2] We reverse.

## NATURE OF THE MOTION UNDER REVIEW

As a preliminary matter, this court must decide whether it was appropriate for the district court to "convert" the defendant's motion to dismiss into a motion for summary judgment.[3] Main Hurdman asserts that its motion was a Fed.R.Civ.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and that it was in-

---

1. For convenience these statutes are sometimes collectively referred to herein as the Acts or the Antidiscrimination Acts, laws, or statutes.

2. On appeal, the United States Equal Employment Opportunity Commission ("EEOC") was granted permission to appear as Amicus Curiae. It has filed a brief and orally argued the case.

3. The district court stated that "[b]ecause both parties have submitted affidavits in support of their positions, I will treat the defendant's motion as one for summary judgment under Fed.R. Civ.P. 56." *Wheeler v. Main Hurdman*, Civ. No. 85–C–163, slip. op. at 1 (D.Colo. Aug. 13, 1985).

appropriate to convert it into a motion for summary judgment absent notice to the parties.

The appellant's motion does appear to be a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.[4] As a general rule, a 12(b)(1) motion cannot be converted into a motion for summary judgment under Rule 56. *Nichols v. United States,* 796 F.2d 361, 366 (10th Cir.1986) (quoting 5 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1366 (Supp. 1986)). *See also Crawford v. United States,* 796 F.2d 924 (7th Cir.1986); *Stanley v. CIA,* 639 F.2d 1146, 1157–58 (5th Cir. Unit B Mar. 1981).[5] There is, however, a widely recognized exception to this rule. If the jurisdictional question is intertwined with the merits of the case, the issue should be resolved under 12(b)(6) or Rule 56. *Timberlane v. Bank of America,* 749 F.2d 1378 (9th Cir.1984) (*"Timberlane II"*); *Sun Valley Gas,* 711 F.2d at 139; *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982); *Eaton v. Dorchester Development, Inc.,* 692 F.2d 727, 733 (11th Cir.1982); *Black v. Payne,* 591 F.2d 83, 86 n. 1 (9th Cir.1979); *see also* J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 12.07[2.–1] at 12–51 (1986).

When subject matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case, the jurisdictional claim and the merits are considered to be intertwined. *Clark v. Tarrant County,* 798 F.2d 736, 742 (5th Cir. 1986) (Title VII) (determination of whether defendant was an "employer"); *Timberlane II,* 749 F.2d at 1381–82; *Sun Valley Gas,* 711 F.2d at 139; *Timberlane I,* 549 F.2d at 602; *McConnell v. Frank Howard Allen & Co.,* 574 F.Supp. 781, 783–84 (N.D. Cal.1983). Courts have invoked this rule when subject matter jurisdiction has turned on whether a particular investment was a "security" under the federal securities statutes. *Odom v. Slavik,* 703 F.2d 212, 215–16 (6th Cir.1983); *Mason v. Unkeless,* 618 F.2d 597, 598 (9th Cir.1980); *Smith v. Gross,* 604 F.2d 639, 641 (9th Cir.1979); *Black v. Payne,* 591 F.2d 83 (9th Cir.1979); *Roark v. Belvedere, Ltd.,* 633 F.Supp. 765, 770 (S.D.Ohio 1985); *McConnell,* 574 F.Supp. at 783–84.

We find that the determination of whether Wheeler qualifies as an employee under the federal discrimination statutes is both a jurisdictional question and an aspect of the substantive claim in her discrimination action. Since both parties have submitted additional evidence beyond the pleadings, and since the district court relied on this information, the motion was appropriately characterized as a motion for summary judgment.

Main Hurdman argues that it was not given the notice to which it was entitled prior to the court converting and ruling on the motion as a motion for summary judgment. The Tenth Circuit does require notice under such circumstances to prevent "unfair surprise." *Nichols,* 796 F.2d at

---

**4.** Main Hurdman's Motion to Dismiss states: "[P]ursuant to Rules 12(b) and 12(h)(3) of the Federal Rules of Civil Procedure, [the defendant] moves this Court to dismiss the Complaint filed in this action for lack of subject matter jurisdiction...." Defendant's Motion to Dismiss at 1.

**5.** Unlike the strict limitations under 12(b)(6) against considering matters outside the complaint, a 12(b)(1) motion is considered a "speaking motion" and can include references to evidence extraneous to the complaint without converting it to a Rule 56 motion. *Crawford v. United States,* 796 F.2d 924 (7th Cir.1986); *Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir. 1986); *Indium Corp. of America v. Semi-Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985); *Sun Valley Gas v. Ernst Enterprises, Inc.,* 711 F.2d 138, 139 (9th Cir.1983); *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982); *Timberlane v. Bank of America,* 549 F.2d 597, 601–03 (9th Cir.1976) (*"Timberlane I"*). A court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts under 12(b)(1). Frequently, courts look to Rule 56 for guidance in ruling upon evidentiary matters under 12(b)(1). *Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1131 (2nd Cir.1976). The primary difference is not in the procedures used but in the effect the ruling will have upon the parties: a dismissal under 12(b)(1) allows for the possibility of repleading the action to bring it within the subject matter jurisdiction of the court. A grant of summary judgment resolves the issue on the merits and thus is with prejudice. *Indium,* 781 F.2d at 883; J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 12.07[2.–1] (1986).

364. In this case, however, there is no unfair surprise. Both parties submitted material beyond the pleadings. We have previously held that when a party submits material beyond the pleadings in support of or opposing a motion to dismiss, the prior action on the part of the parties puts them on notice that the judge may treat the motion as a Rule 56 motion. *Id.* The fact that Main Hurdman characterizes its motion as a Rule 12(b)(1) motion does not change our analysis. Main Hurdman identified its motion only as a 12(b) motion without specifying a particular subsection. Although the motion was made on the ground that there was a lack of subject matter jurisdiction, it was also based on the ground that Wheeler "does not and cannot state a claim" upon which relief could be granted. Main Hurdman's Motion to Dismiss at ¶¶ 8, 10, 12. Under these circumstances, it was appropriate for the court to consider the motion as a motion in the alternative under 12(b)(1) and 12(b)(6) and to convert the motion to a Rule 56 motion when extraneous evidence was submitted in the form of affidavits by both parties. We find that it was not error for the district court to convert the motion and we will review it as a motion for summary judgment.

## STANDARD OF REVIEW

In reviewing a district court's grant or denial of summary judgment, we apply a *de novo* standard of review to legal determinations. *See Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987); *see also Hydro Conduit Corp. v. American-First Title & Trust Co.*, 808 F.2d 712, 714 (10th Cir.1986) ("When a district court has granted summary judgment, the court of appeals applies a de novo standard of review."); *Baker v. Penn Mutual Life Ins. Co.*, 788 F.2d 650, 653 (10th Cir. 1986); *Morgan v. Mobil Oil Corp.*, 726 F.2d 1474, 1477 (10th Cir.1984). As for allegations of fact by the parties, the general rule is that our view of the facts must indulge all reasonable inferences in favor of the party opposing a motion for summary judgment. *Franks v. Nimmo*, 796 F.2d 1230, 1235 (10th Cir.1986); *Baker*, 788 F.2d at 653; *Lindley v. Amoco Prod. Co.*, 639 F.2d 671, 672 (10th Cir.1981). In this case, the essential facts governing our disposition on appeal (as opposed to how those facts are characterized or legal conclusions argued from them by the parties) are uncontested.

## BACKGROUND

Wheeler's credentials, including professional activities and affiliations, are substantial. Her employment experience with Main Hurdman was characterized by steady advancement as an employee-accountant. She was made a partner of Main Hurdman in April 1982. At that time approximately 14%, or 502 of Main Hurdman's 3570 personnel were partners.

Partnership consisted at least of the following: election to the partnership and execution of the Firm's partnership agreement;[6] change in compensation from salary to a share of the Firm's profits, paid by draw and an allocation of profits based on points; a contribution to capital; establishment of a capital account; unlimited personal liability for the debts and obligations of the partnership; rights under the partnership agreement to vote on such matters as amendments of the partnership agreement, approval of mergers with other accounting firms of a certain size, admission of new partners, termination of a partner's interest, approval of draws, shares of net profits, special distributions, and any other income to be allocated to any partners, and dissolution of the firm. In addition, Wheeler became eligible for certain rights and privileges which were enjoyed only by partners of the firm, such as the right to sign audit reports and tax returns and the right to be reimbursed for membership dues in certain clubs;[7] and, she was subject to

---

6. The partnership agreement is not included in the record, but various of its terms are referred to by the parties in their affidavits, and are argued at length in the briefs.

7. There is a conflict in the affidavits on these particulars. Wheeler asserts that she signed tax returns and was reimbursed for certain club dues while still an employee.

involuntary termination of her interest in the partnership only by either: (1) a unanimous vote of the firm's policy board, or (2) an affirmative vote of no less than 75% of the members of the firm's advisory board, or (3) an affirmative vote of no less than 75% of all partners casting votes. Furthermore, by becoming a partner Wheeler surrendered certain employee benefits including prepaid health insurance and life insurance.

Wheeler and the EEOC effectively concede that under laws governing partnerships Wheeler was a bona fide and general partner of Main Hurdman. They similarly concede that Main Hurdman is a bona fide general partnership. It is undisputed that the foregoing facts relating to Wheeler's admission to partnership are not a sham, and have legal substance. Consonant with those facts, there is no allegation that Wheeler was made a partner, or denominated as such and was continued in that status, as a device for avoiding the Acts in question.

However, Wheeler and the EEOC, while not contesting Wheeler's partnership status, point to other facts which they contend portray the economic reality of employee status co-existing with partner status. After being made a partner Wheeler's work remained unchanged. She had the same client load, same duties and responsibilities, same support staff, and was supervised in her work and work assignments, by the same department head. A personnel file was maintained with respect to her and all other personnel, including partners. The amounts charged for her services were established by managing partners. The number of partnership points allocated to her for income purposes was, as a practical matter, determined by the managing partner of her office.[8] Also as a practical matter, a recommendation by the same managing partner that she or any other

partner of that office be expelled from the partnership was the final word, since such recommendations, according to Wheeler, were routinely adopted and appeals of such decisions pursuant to terms of the partnership agreement were unavailing. Wheeler Aff. para. 14.

Wheeler and the EEOC also emphasize that Main Hurdman is a large firm, with eighty offices nationwide. They portray it as a highly organized, centrally managed, business institution of indefinite and ongoing duration; in other words, it looks like a corporation. The operating structure of the partnership, within which Wheeler functioned, is set forth on an exhibit to Wheeler's affidavit in the district court. That exhibit shows the partners of Main Hurdman as the governing body, below which is a policy board and an advisory board to which partners are elected. Below those two boards there is a managing partner/CEO and a chairman who, presumably, are responsible for the day-to-day operations of the partnership. Thereafter, there appear on the organizational chart a myriad of assignments, including international, marketing, human resources, management consulting, professional standards, tax services, finance, and so on. The chart also shows a partner in charge of operations and under that partner six geographical regions with a partner in charge of each. Within each region the location of Main Hurdman offices is identified, with a local "partner in charge" of each office. The local partner in charge oversees assignment of department heads, allocation of partner credit for client hours managed, the establishment of performance goals for all personnel, assignment of CPAs to clients, the amount to be charged for services, and the hours, dates and places when and where work is to be performed. It is contended that although each partner is

8. With respect to compensation, partners received a guaranteed draw plus an allocation of profits. The profits are allocated through a process of point distribution. The managing partner and policy board first decide on the amount of points to be allocated to each local office; this decision is ratified by the partners at the annual meeting. The regional or local part-

ner in charge then allocates points to each individual partner, in part according to the number of clients he or she managed. The allocation of points to individuals is not reviewed by other partners. Therefore, according to Wheeler, "the local partner in charge has direct control over the amount of compensation to be paid ... to 'partners.'" Wheeler Aff. para. 11.

entitled to vote at annual or special meetings, the votes are primarily for the purpose of ratifying decisions made by the managing partner, policy board or "nominating" committee.

Finally, Wheeler and the EEOC make much of the fact that as a partner Wheeler's initial contribution to capital was just $4,000, representing only a .000058 share of the firm's total capital account.[9] It is also a fact, however, that thirteen months later Wheeler signed a letter of "withdrawal" from the partnership in which reference was made to her capital account containing a minimum of $15,000 plus an unspecified additional balance, plus additional profit allocations to be determined twelve months from the date of termination—all of which was to be paid to Wheeler as a terminating general partner. West Aff., Ex. B. Thus, whatever the true percentage of Wheeler's partnership interest, it translated into sums of money which were not insignificant.

In April 1983, one year after being made a partner, Wheeler was informed by Richard West, Manager of the Denver office, that she would be severed from the Firm as of September 30 of that year. A letter of "withdrawal" signed by West and Wheeler set forth certain financial and other terms relating to the severance, all of which apparently were honored by the parties. Official severance occurred on September 30, 1983. Following expulsion, Wheeler filed, in January 1984, a charge of discrimination with the EEOC. On October 22, 1984, the EEOC issued to Wheeler a Notice of Right to Sue. This suit, filed on January 22, 1985, followed.

I.

GENERAL STANDARDS GOVERNING REVIEW OF ANTIDISCRIMINATION ACTS

■■■ In our review of the antidiscrimination laws we must be mindful of their

remedial purposes, and liberally interpret their provisions to that end. *Martinez v. Orr,* 738 F.2d 1107, 1110 (10th Cir.1984) (Title VII) (quoting *Davis v. Valley Distributing Co.,* 522 F.2d 827, 832 (9th Cir. 1975), *cert. denied,* 429 U.S. 1090, 97 S.Ct. 1099, 51 L.Ed.2d 535 (1977)); *see also Owens v. Rush,* 636 F.2d 283, 287 (10th Cir. 1980) (Title VII). Such interpretation, however, cannot be used as a justification for rewriting the statutes. Legislative ends are circumscribed by statutory means. Thus, while the case before us deals with a charge of discrimination, the root of our inquiry is one of statutory interpretation.

II.

PARTNER AS COVERED EMPLOYEE UNDER THE ANTIDISCRIMINATION ACTS

A. *The Controlling Statutory Language.*

Title VII provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). The language of the ADEA is nearly identical.[10] The Equal

---

9. There is a factual dispute on the question of capital contribution which we do not pursue, given the applicable standard of review here.

10. 29 U.S.C. § 623(a) provides:

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

Pay Act of the FLSA, 29 U.S.C. § 206(d)(1) provides:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

The statutory definition of employee under each of these Acts is virtually identical,[11] and circular in its description. Title VII defines employee as "an individual employed by an employer." It defines employer as "a person engaged in an industry affecting commerce who has fifteen or more employees." 42 U.S.C. § 2000e(b). The ADEA definition is identical except that it requires an employer to employ twenty or more employees. *See* 29 U.S.C. § 630(b). The definition of employer under the FLSA is equally circular: " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Under each act, a "person" is defined to include partnerships. 29 U.S.C. § 203(a); 29 U.S.C. § 630(a); 42 U.S.C. § 2000e(a).[12]

All parties acknowledge that nothing in the legislative history of these Acts explicitly addresses the definition of employee.[13] In general, cases construing definitions of one of the Acts are to be viewed as persuasive authority when interpreting the others. *See Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978); *Hyland v. New Haven Radiology Assocs.,* 794 F.2d 793 (2nd Cir.1986).

### B. Judicial and Agency Postures.

#### 1. Judicial Interpretation.

To date, courts have shown no disposition to extend these statutory employee protections to general partners.[14] The most widely recognized recent case is *Hishon v. King & Spaulding,* 678 F.2d 1022 (11th Cir.1982), *rev'd on other grounds,*

---

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

**11.** There are only minor variations among the statutes. *See* 42 U.S.C. § 2000e(f) (Title VII) ("an individual employed by an employer"); 29 U.S.C. § 630(f) (ADEA) ("an individual employed by any employer"); 29 U.S.C. § 203(e)(1) (FLSA) ("any individual employed by an employer").

**12.** There is no dispute that Main Hurdman is an employer under the Acts.

**13.** Senator Hugo Black stated during debates on the FLSA that the term "employee" in the Act was given the "broadest definition that has ever been included in any one Act." (81 Cong.Rec. 7657 (1938) (quoted in *United States v. Rosenwasser,* 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 296 n. 3, 89 L.Ed. 301 (1945)). During the Senate debate on Title VII, Senator Joseph Clark of Pennsylvania stated that the term "employer" was "intended to have its common dictionary meaning except as qualified by the Act." 110 Cong.Rec. 7216 (daily ed., Apr. 8, 1964). In

*Hishon v. King & Spaulding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), the Supreme Court referred to Senator Cotton's colorful comment that selecting a partner was like selecting a spouse. The Court observed that "it is unclear to what extent Congress shared his concerns about selecting partners" but "[i]n any event, his views hardly conflict with our narrow holding today...." *Id.* at 78–79 n. 10, 104 S.Ct. at 2235 n. 10.

**14.** Both Wheeler and the EEOC place heavy reliance on *EEOC v. Peat, Marwick, Mitchell & Co.,* 775 F.2d 928 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). We do not read similar import and meaning into that decision. The holding permitted enforcement of an EEOC subpoena issued to a partnership to investigate whether partners were employees for purposes of the ADEA. But the court was obviously focusing on the preliminary and procedural, not substantive, aspects of the matter. The law being examined was that pertaining to subpoena enforcement, not the ADEA. The court made clear that: "It can no longer be disputed that 'a subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute.' " *Id.* at 930 (quoting *Donovan v. Shaw,* 668 F.2d 985, 989 (8th Cir.1982)).

467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). That case involved a Title VII claim asserted by a female lawyer-associate with respect to her firm's alleged refusal to consider her for partnership. In reversing the Eleventh Circuit the Supreme Court concluded "that in appropriate circumstances partnership consideration may qualify as a term, condition, or privilege of a person's employment" for purposes of Title VII coverage. *Hishon*, 467 U.S. at 78 n. 10, 104 S.Ct. at 2235 n. 10. However, the Court did not reach the question of application of Title VII to partners themselves. Thus, the views of the Eleventh Circuit on that subject remain as stated in its opinion in *Hishon*. There, the circuit court expressed reluctance to equate partners with employees, stating "the partners own the partnership; they are not its 'employees' under Title VII. We find a clear distinction between employees of a corporation and partners of a law firm." *Hishon*, 678 F.2d at 1028.

The Seventh Circuit expressed similar views in *Burke v. Friedman*, 556 F.2d 867 (7th Cir.1977), which involved an accounting firm. The question in *Burke* was whether individual partners of the partnership could be counted as employees for purposes of the fifteen-employee minimum for Title VII coverage. The Seventh Circuit held they could not, under the facts of that case. In reaching its holding, the court said:

> Partners manage and control the business and share in the profits and losses. *See Commissioner of Internal Revenue v. Tower*, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670 (1946); *Wilson v. Commissioner of Internal Revenue*, 161 F.2d 661, 664 (7th Cir.1947). In light of the foregoing, we do not see how partners can be regarded as employees rather than as employers who own and manage the operation of the business.
>
> \*     \*     \*     \*     \*     \*
>
> [Section] 2000e(f) does not expand the definition of employee to include a partner.

*Id.* at 869–70 (footnote omitted).

The reasoning in *Burke* was reconfirmed by an en banc panel of the Seventh Circuit

in 1984 in *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177 (7th Cir.1984). In *Dowd*, it was held that lawyer/shareholders of a professional corporation were not employees for purposes of Title VII coverage because they were, in essence, partners in a partnership. Within the past year the Second Circuit has taken an opposite view with respect to professional corporations, holding that radiologist/shareholders in a professional corporation were employees of the corporation, rather than partners, for purposes of ADEA coverage. *Hyland v. New Haven Radiology Assocs.*, 794 F.2d 793 (2nd Cir.1986). *See also Reiver v. Murdoch & Walsh*, 625 F.Supp. 998 (D.Del. 1985). But the Second Circuit stressed the importance of the chosen form of business entity, stating: "While those who own shares in a corporation may or may not be employees, they cannot under any circumstances be partners in the same enterprise because the roles are mutually exclusive." *Id.* at 798. As to partnerships themselves the court stated:

> It is generally accepted that the benefits of the antidiscrimination statutes … do not extend to those who properly are classified as partners.
>
> \*     \*     \*     \*     \*     \*
>
> The fact that certain modern partnerships and corporations are practically indistinguishable in structure and operation, however, is no reason for ignoring a form of business organization freely chosen and established.

*Id.* at 797–98.

Two federal district courts have recently held that partners are not employees for purposes of the ADEA. *Maher v. Price Waterhouse*, Civ. No. 84–1522 C (2) (E.D.Mo. April 8, 1985) [Available on Westlaw, DCT database]; *Holland v. Ernst & Whinney*, 35 Empl.Prac.Dec. (CCH) ¶ 34,-653 (N.D.Ala. August 17, 1984). Both cases involved partners in "Big Eight" accounting firms.

Finally, in his much-quoted concurring opinion in *Hishon*, Justice Powell stated:

> I write to make clear my understanding that the Court's opinion should

not be read as extending Title VII to the management of a law firm by its partners. The reasoning of the Court's opinion does not require that the relationship among partners be characterized as an 'employment' relationship to which Title VII would apply.

467 U.S. at 79, 104 S.Ct. at 2236. The significance of Justice Powell's observation must, of course, be tempered by the fact that no other justice joined the concurring opinion, and by allusions to a highly interactive partnership characterized by common agreement or consent among the partners.

2. *Agency Interpretation.*

Turning from cases to the question of relevant agency interpretation of these Acts we are aided but little. The EEOC refers us to no directly relevant published agency positions regarding the ADEA and FLSA. Two references, twenty years apart, are cited pertaining to Title VII coverage of partners. Both sides rely on them. The first is a 1965 General Counsel opinion letter, which the Commission apparently cannot find, Brief of EEOC at 24 n. 20, but which is asserted by Main Hurdman to rule that partners of a law firm may not be employees. In support of its view, Main Hurdman refers to a listing of the opinion published in a quarterly digest, "Digest of Legal Interpretations Issued or Adopted by the Commission," October 9, 1965 through December 31, 1965, § I(B)(6) at 2–3. In contrast, the EEOC refers to the annual Digest listing of the same opinion, which states that although the specific ruling found that partners were not employees, "the determination of whether partners of the [law] firm are 'employees' within the meaning of Title VII must be determined on a case-by-case basis." EEOC, First Annual Digest of Legal Interpretations, July 2, 1965 through July 1, 1966, § I(B)(5) at 6. Neither reference is sufficiently explanatory to be helpful; they are so scanty and open to argument in almost every respect that they fall short of agency interpretation which guides us.

The second and only other reference on point given to us by the EEOC is a 1985 EEOC decision that partners in an eight-partner, twelve-employee law firm were *not* employees for Title VII purposes. EEOC Decision No. 85-4, 2 Empl.Prac. Guide (CCH) ¶ 6846 at 7040–41 (1985). The EEOC contends the decision is not inconsistent with its position that partners can be employees under Title VII, and that a case-by-case determination is required. Such argument is based on two considerations. First, a footnote in the decision refers to factors to be considered in determining whether an individual is a partner or an employee in a particular case. Second, the decision itself was based on its own facts. We do not view the decision, however, as squarely supporting the present EEOC position. The decision displays no agency inclination whatsoever to pursue an aggressive inquiry into whether or not, as a matter of economic reality, any of the partners involved in that case were dominated in their work, in management or control of partnership affairs, in decisions on sharing profits, or in any other respect. Yet that is the approach urged upon us by the EEOC in this case. In the 1985 decision all such factors were essentially decided by the Commission by reference to the written terms of the partnership agreement, with only a passing reference to an absence of evidence that the "business is carried out in any other way than as indicated in the partnership agreement." *Id.* at 7040. The accompanying footnote, emphasized here by the EEOC, refers first to Justice Powell's language in *Hishon* that "an employer may not evade the strictures of Title VII *simply by labeling* its employees as 'partners.' " *Id.* at 7041 n. 4 (emphasis added). Following that quote the Commission states: "The Commission recognizes that there *may* be *a* case where an individual is called a partner, but who may really be an employee." *Id.* (emphasis added). Only then is there reference to factors which may be relevant in making such a determination. It is evident from both the language and tone of that footnote that even as recently as 1985 the Commission

did not envision the wholesale inquiries proposed here.[15]

It is apparent that the EEOC has not historically espoused the stand it takes here. To the contrary, for many years following its creation under Title VII in 1964, the Commission by its relative silence and inaction, and its approach to the issue when raised, made it seem likely that it doubted any general coverage of partners by Title VII, excluding obvious sham situations. Thus, we accord less weight to the arguments of the EEOC in this case than if the Agency's position had been clearly developed proximate in time to passage of Title VII or to the transfer of responsibility for the ADEA and the Equal Pay Act from the Department of Labor to the EEOC in 1979, and consistently applied thereafter.

Although not one court has applied the Acts to a bona fide general partner against his or her partners or partnership, it is not surprising that Wheeler and the EEOC press the issue now. In recent years, literally dozens of articles touching on the reach of the antidiscrimination statutes have been solidly in favor of definitions which would be broad enough to include general partners.[16] Peripherally relevant extensions of coverage by the courts have occurred, *Hishon* being the most visible.

*See Lucido v. Cravath, Swaine & Moore,* 425 F.Supp. 123 (S.D.N.Y.1977); *EEOC v. Rinella & Rinella,* 401 F.Supp. 175 (N.D. Ill.1975). *See also EEOC v. Peat, Marwick, Mitchell & Co.,* 775 F.2d 928 (8th Cir.1985), *aff'g,* 589 F.Supp. 534 (E.D.Mo. 1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986).

Furthermore, there are so many partnerships engaged in day to day commerce in this country in ever expanding numbers that the statistical chance of discrimination claims has increased as a result of growth alone.[17] Then too, the changing status of women and minorities figures significantly in the equation. While partnerships of professionals have been common throughout the history of this country, as recently as twenty years ago relatively few women and minorities were represented, which may account for the early absence of discrimination suits against partnerships. Over the past two decades ever increasing numbers of women and minorities have been admitted into professional schools, thence into the professions.[18] Additional years have been required for their advancement to partnership status. Finally, growing experience under and familiarity with these Acts is producing an increase in discrimination claims against partnerships.

**15.** The Seventh Circuit noted in *Burke v. Friedman* that the EEOC had dismissed the plaintiff's Title VII complaint against the law firm partnership *for want of subject matter jurisdiction.* No factual inquiry, as urged here, was indicated. *Burke,* 556 F.2d at 868.

**16.** *See* for example: Bartholet, *Application of Title to Jobs in High Places,* 95 Harv.L.Rev. 5, 947 (1982); Dowd, *The Test of Employee Status: Economic Realities and Title VII,* 26 Wm. & Mary L.Rev. 75 (1984); Newcomb, *Hishon v. King & Spaulding: Discrimination in Professional Partnerships,* 62 Den.U.L.Rev. 2, 485 (1985); Note, *Civil Rights: Law Partners as Employees for Title VII Purposes?,* 35 U.Fla.L.Rev. 201, (1983); Note, *Hishon v. King & Spaulding: Implications for the Private Partnership,* 14 Cap.U. L.Rev. 151 (1984); Note, *EEOC Subpoena Enforcement to Determine ADEA Coverage of Partnership Retirement Policy—EEOC v. Peat Marwick Mitchell & Co.,* 19 Creighton L.Rev. 967 (1986); Note, *Tenure and Partnership as Title VII Remedies,* 94 Harv.L.Rev. 2, 457 (1980); Note, *Applicability of Federal Antidiscrimination Legislation to the Selection of a Law Partner,* 76 Mich.L.Rev. 282 (1977); Note, *The Application*

*of Title VII to Law Firm Partnership Decisions: Women Struggle to Join the Clubs,* 44 Ohio St. L.J. 841 (1983); Note, *The Age Discrimination in Employment Act and Mandatory Retirement of Law Firm Partners,* 53 S.Cal.L.Rev. 1679 (1980).

**17.** The statistical abstract, for example, shows total United States partnerships in the service area as growing from 239,000 in 1979 to 306,000 in 1983. Bureau of Census, U.S. Dept. of Commerce, Statistical Abstract of the U.S., 506 (107th ed. 1987) [hereinafter Statistical Abstract]. Lawyers practicing as partners grew from 92,442 in 1970 to 190,187 in 1980. Statistical Abstract at 167 (107th ed. 1987).

**18.** For example, according to the statistical abstract of the United States, women comprised only 17% of all accountants in 1960 but by 1985 they comprised 44% of all accountants. Statistical Abstracts at 361–63 (96th ed. 1975); Statistical Abstracts at 385 (107th ed. 1987). Furthermore, only 230 law degrees were conferred upon women in 1960, comprising 2.5% of the total, compared to 13,630 degrees in 1984, amounting to 36.8% of the total. Statistical Abstract at 148 (107th ed. 1987).

These facts may provide a better or more complete explanation for the history of judicial and agency actions, omissions, or silence since 1964 concerning the merits of the issue of partners as employees under the Antidiscrimination Acts. Therefore, absence of a long-standing and reliable EEOC position is no surprise. Nonetheless, a disposition on the merits is made more difficult by its absence.

### C. *Partnership Attributes and Proposed Tests for Determining Employee Status.*

Predictably both sides attempt to control the focus of our inquiry. Main Hurdman dwells largely on characteristics of partnerships, while Wheeler and the EEOC concentrate on traits associated with employment. With respect to employment, various tests and factors which have been judicially created and applied in other situations are proposed. The remedial nature of the Acts is stressed both in conjunction with tests for employee status, and as a justification of its own.

We address the parties' positions first by reviewing aspects of partnerships generally, then by reviewing the proposed employee tests, then by analyzing them together.

### 1. *Partnership Status Generally.*

While there may be no federal partnership law, as Wheeler argues, partnerships are firmly embedded in our jurisprudence and commonly referred to in universally understood ways by Congress and the courts without the necessity of dissecting the partnership law of each state in order to derive meaning. By the time the FLSA was first enacted in 1938, the Uniform Partnership Act ("UPA") had been adopted by eighteen states.[19] When Title VII was enacted in 1964 and the ADEA in 1967, forty states had adopted the UPA as the governing body of partnership law. As of 1984, forty-eight states, several territories, and the District of Columbia had adopted the UPA. Only Georgia and Louisiana have not adopted the uniform act. 6 Unif.

Laws Ann. 1 (Supp.1984) (table). Despite some differences in partnership law between states, the general indicia of partners and partnership are very similar across state lines. The UPA sets forth, among others, the following characteristics of a partner: (1) unlimited liability (§ 15); (2) the right to share in profits and participate in management subject to agreement between partners (§ 18(a), (e)); (3) the right and duty to act as an agent of the other partners (§ 9); and (4) shared ownership (§ 6). In *Freese v. United States*, 455 F.2d 1146, 1150–51 (10th Cir.1972), *cert. denied*, 409 U.S. 879, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972), we stated that the parties' intent was the touchstone for finding a partnership relationship.

Citing those indicia of partnership, Main Hurdman contends that a partner *by definition* is not an employee under traditional common law principles. Status as a co-owner precludes simultaneous status as an employee.

Multiple rebuttals are offered to that argument. Owners in other contexts can be employees. *See Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (members/owners of a knitting cooperative considered employees); *Zimmerman v. North American Signal Co.*, 704 F.2d 347 (7th Cir.1983) (corporate vice-president and shareholder considered employee); *EEOC v. First Catholic Slovak Ladies Ass'n*, 694 F.2d 1068 (6th Cir.1982), (officers-directors considered employees), *cert. denied*, 464 U.S. 819, 104 S.Ct. 80, 78 L.Ed.2d 90 (1983); *Hoy v. Progress Pattern Co.*, 217 F.2d 701 (6th Cir.1954) (shareholder, vice-president, director and chairman of board considered employee). *Cf. Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297 (9th Cir.1982) (sale of corporate stock subject to Title VII where employment status is tied to stock ownership), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984); *Marshall v. R. & M. Erectors, Inc.*, 429 F.Supp. 771 (D.Del. 1977) (worker considered an employee and not a partner where there was no written

---

**19.** In the United States, work began on a UPA in 1902, but it was not completed until 1914. A brief but thorough account of the drafting of the UPA is found in 6 Unif.Laws Ann. at 5–8 (1969).

partnership agreement or evidence of partner attributes). For many purposes evolving law now classifies partnerships as separate entities rather than an aggregate of partners; thus, partners can be classed as employees of the partnership entity.[20] Furthermore, ownership in very large partnerships is de minimus on an individual basis (Wheeler as one of 500, for instance). Finally, big partnerships are like corporations: "Wall Street law firms and stock brokerage firms provide significant examples. These are often large, impersonal, highly structured enterprises of essentially perpetual duration." *Bellis v. United States,* 417 U.S. 85, 93–94, 94 S.Ct. 2179, 2185–86, 40 L.Ed.2d 678 (1974).[21]

Considering the many exceptions in the law we must agree with Wheeler and the EEOC that categorical absolutes are difficult to sustain in this area. However, there is no discernable trend to erase the traditional line between partners and employees. For instance, state courts defining "employee" for purposes of workmen's compensation laws have usually refused to classify partners as employees absent express statutory authority. "With the exception of Oklahoma and Louisiana, every state that has dealt judicially with the status of 'working partners' or joint venturers

has held that they cannot be employees." 1C A. Larson, *The Law of Workmen's Compensation* § 54.30 (1986) (footnotes omitted). In *Robertson v. Alexander Grant & Co.,* 798 F.2d 868 (5th Cir.1986), cert. denied, —— U.S. ——, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987), the Fifth Circuit found that the Employee Retirement Income Security Act ("ERISA") did not apply to partners.[22] For purposes of ERISA, the Secretary of Labor has issued the following regulation: "A partner in a partnership and his or her spouse shall not be deemed to be employees with respect to the partnership." 29 C.F.R. § 2510.3–3(c)(2) (1986). In *United States v. Empey,* 406 F.2d 157 (10th Cir.1969), this court found that a partner was not an employee for the purpose of certain tax statutes; therefore, it was necessary under the tax laws for professionals to incorporate in order to obtain retirement plan benefits available to corporate employees.[23]

### 2. *The Economic Realities Test For Determining Employee Status.*

Wheeler and the EEOC urge adoption of an "economic realities" test for discerning employees among partners, on a case-by-case basis.[24] Economic reality to them

---

**20.** *See generally* J. Crane and A. Bromberg, *Law of Partnership,* sections 68–70 (1968). In *Bellis v. United States,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974) the Supreme Court applied the entity theory of partnerships to support its holding that a member of a three-partner law firm could not claim his Fifth Amendment privilege against self incrimination in order to avoid compliance with a grand jury subpoena ordering production of the partnership's financial records. In *Armstrong v. Phinney,* 394 F.2d 661 (5th Cir.1968), a partner who managed a ranch owned by the partnership was classified for tax purposes as an employee of the partnership entity.

**21.** *See generally* discussion in Note, *Applicability of Federal Antidiscrimination Legislation to the Selection of a Law Partner,* 76 Mich.L.Rev. 282, 286–92 (1977).

**22.** The ERISA definition of "employee" is identical to the FLSA definition.

**23.** The EEOC points out that in *Clarkson Constr. Co. v. Occupational Safety & Health Rev. Comm.,* 531 F.2d 451, 457 (10th Cir.1976), we

stated generally that common law standards are not dispositive in defining an employee for OSHA purposes. More to the point, the Bureau of Labor statistics has indicated that partners are not considered employees under OSHA. 1 Empl.Safety & Health Guide (CCH) ¶ 3039.68 (1978) (citing question 37, Bureau of Labor Statistics Report 412.2 (1975)).

**24.** The "economic realities" test, urged upon us by the plaintiff, was originally developed by the Supreme Court in the 1940s to distinguish independent contractors from employees of an employer for purposes of broadly applying social legislation. The common law "right to control" tests such as those found in the definition of servant in section 220, *Restatement (Second) of Agency,* were rejected. *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (determining whether newsboys were independent contractors or employees under the National Labor Relations Act ("NLRA")); *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) (determining whether truck drivers and unloaders of coal were independent contractors or employees under the NLRA); *Bartels v. Birmingham,* 332 U.S. 126, 67

translates into a condition of domination: Is the individual so dominated in or by the organization that he or she is really like an employee, with corollary susceptibility to discrimination? [25]

Wheeler's brief also emphasizes that employee is defined in terms of the remedial purposes of the statute. Brief of Plaintiff/Appellee at 9–10. "The goal is to rid from the world of work the evil of discrimination." *Id.* at 10 (quoting in part from *Armbruster v. Quinn,* 711 F.2d 1332, 1340 (6th Cir.1983)). Wheeler states: "It is the nature of the work performed, and the independence or lack of independence that makes an individual an employee for purposes of the statutes." Brief of Plaintiff/Appellee at 20. The EEOC echoes the independence versus domination theme, stating that status as an employee "depends in large part on that individual's ability *actually to control* factors such as the management of the firm and critical elements of his or her work." Brief of EEOC at 25 (emphasis added).

Wheeler and the EEOC are not united, however, on what factors best express the domination principle. The district court based its decision on three: power to hire and fire; supervision of work schedules and conditions of employment; and control of compensation. *Wheeler v. Main Hurdman,* No. 85–C–163, slip op. at 2–3 (D.Colo.

Aug. 13, 1985). Although the EEOC included these same factors as well as others in its argument, it ignores any defense of or express reliance on the district court's ruling; Wheeler refers to it more as an afterthought at the conclusion of her main arguments respecting the economic reality test.

The EEOC, "for purposes of this brief" assumes the existence of a hybrid economic reality/common law control test, asserting that most courts have been using that "restrictive" approach. Brief of EEOC at 15, 16, 18 n. 14. It cites at length from *Spirides v. Reinhardt,* 613 F.2d 826, 831–32 (D.C.Cir.1979), indicating approval of the hybrid standard set forth in that case, which included the right to control the means and manner of the worker's performance, plus eleven additional factors. In *Spirides,* the court stated:

*[D]etermination of whether an individual is an employee or an independent contractor for purposes of the Act involves, as appellant suggests, analysis of the "economic realities" of the work relationship.* This test calls for application of general principles of the law of agency to undisputed or established facts. Consideration of all of the circumstances surrounding the work relationship is essential, and no one factor is

S.Ct. 1547, 91 L.Ed. 1947 (1947) (determining whether dance bands were independent contractors or employees of dance halls under the Social Security Act ("SSA")). Although many of the early cases involved interpretations under the NLRA and the SSA, the Supreme Court held that these decisions were persuasive in defining the coverage under the FLSA. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 723, 67 S.Ct. 1473, 1474, 91 L.Ed. 1772 (1947). *See also Hyland v. New Haven Radiology Assocs.,* 794 F.2d 793, 796 (2nd Cir.1986) ("cases construing the definitional provisions of [the FLSA, Title VII or the ADEA] are persuasive authorities when interpreting the others"); *Armbruster v. Quinn,* 711 F.2d 1332, 1336 (6th Cir.1983) (NLRA provides guidance for Title VII). Subsequent to *Hearst, Silk,* and *Bartels,* Congress amended the NLRB and SSA to restore common law definitions to employee/independent contractor distinctions, but made no similar amendment to the FLSA. Writers urging a holistic approach to the legislative history of Title VII and the ADEA point out that by omitting the type of exclusions found in the NLRA and SSA Congress intended

the broad definitions under and application of the FLSA to apply. *See, e.g.,* Dowd, *The Test of Employee Status: Economic Realities in Title VII,* 26 Wm. & Mary L.Rev. 75, 89–96 (1984).

**25.** The relationship is described as one of inequality of bargaining power and economic dependence. Dowd, *supra* note 24, at 85–86.

Control of employment opportunities is the linchpin of the economic realities test, viewed from the perspective of the employee's dependency on the employer and vulnerability to discriminatory conduct.

\* \* \* \* \* \*

[T]he focus of the analysis must be on whether the employer controls employment opportunities because of its position in the employment marketplace or because of its ability to determine the terms and conditions of employment. This requires an economic analysis of institutional and societal patterns of discrimination that affect the employment marketplace....

*Id.* at 112–13 (footnote omitted).

determinative. Nevertheless, the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review here, as it is at common law and in the context of several other federal statutes. If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.

Additional matters of fact that an agency or reviewing court must consider include, among others, (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.*, by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* at 831–32 (footnotes omitted) (emphasis added). The EEOC, in a 1985 decision, classified as relevant factors "the individual's ability to control and operate the business and to determine compensation and the administration of profits and losses." EEOC Decision No. 85–4, 2 Empl.Prac. Guide (CCH) ¶ 6846, 7041 n. 4 (1985).

Wheeler places no such reliance on *Spirides*. Her brief quotes at length from *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961).[26] *Goldberg*, in turn, is not similarly relied upon by the EEOC.

The EEOC points out that the liberal definitions given to the term "employee" under early Supreme Court cases applying the FLSA, *see supra* note 24, still apply, and therefore argues that our opinion in *Doty v. Elias*, 733 F.2d 720 (10th Cir.1984), is relevant.[27] In *Doty* we held that certain

---

**26.** In *Goldberg* the Supreme Court found that for purposes of the FLSA certain homeworkers were employees as well as members of a cooperative, which they had each paid three dollars to join. The Court first outlined the long regulatory history dealing specifically with prohibitions against homework, and stated:

We think we would be remiss, in light of this history, if we construed the Act loosely so as to permit this homework to be done in ways not permissible under the Regulations. By § 3(d) of the Act an "employer" is any person acting "in the interest of an employer in relation to an employee." By ¶ 3(g) the term employ "includes to suffer or permit to work." We conclude that the members of this cooperative are employees within the meaning of the Act.

\* \* \* \* \* \*

It is the cooperative that is affording them "the opportunity to work, and paying them to do it," to use the words of Judge Aldrich, dissenting below. 275 F.2d, at 366. However immediate or remote their right to "excess receipts" may be, they work in the same way as they would if they had an individual proprietor as their employer. The members are not self-employed; nor are they independent, selling their products on the market for whatever price they can command. They are regimented under one organization, manufacturing what the organization desires and receiving the compensation the organization dictates. Apart from formal differences, they are engaged in the same work they would be doing whatever the outlet for their products. The management fixes the piece rates at which they work; the management can expel them for substandard work or for failure to obey the regulations. The management, in other words, can hire or fire the homeworkers. Apart from the other considerations we have mentioned, these powers make the device of the cooperative too transparent to survive the statutory definition of "employ" and the Regulations governing homework. In short, if the "economic reality" rather than "technical concepts" is to be the test of employment (*United States v. Silk*, 331 U.S. 704, 713 [67 S.Ct. 1463, 1468, 91 L.Ed. 1757]; *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 [67 S.Ct. 1473, 1476, 91 L.Ed. 1772], these homeworkers are employees.
366 U.S. at 31–33, 81 S.Ct. at 935–36 (1961) (footnotes omitted).

**27.** The EEOC states:

With respect to the Equal Pay Act, the FLSA test, endorsed by this Court in *Doty v. Elias,* is

waiters and waitresses were employees, rather than independent contractors as claimed by the owner of the restaurant where they worked. We said:

> In determining whether an individual is an "employee" within the meaning of the FLSA, we must look to the economic realities of the relationship. *Castillo v. Givens,* 704 F.2d 181, 188 (5th Cir.), *cert. denied,* [464] U.S. [850], 104 S.Ct. 160, 78 L.Ed.2d 147 (1983). The focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service, *see Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947), or is, as a matter of economic fact, in business for himself. *Donovan v. Tehco, Inc.,* 642 F.2d 141, 143 (5th Cir.1981). In applying this test, the courts generally focus on five factors: (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; and (5) the degree of skill required to perform the work. *Trustees of Sabine Area Carpenters' Health & Welfare Fund v. Don*

*Lightfoot Home Builder, Inc.,* 704 F.2d 822, 825 (5th Cir.1983).

*Id.* at 722–23.

The foregoing survey of tests and factors offered by the proponents has been set forth in detail partly for purposes of our analysis, and partly to show the absence, rather than the presence, of any coherent standard of "economic reality" for supposed application to partners.

### 3. *Application of the Proposed Economic Realities Test and Factors to Partnerships.*

This court is committed to use of an economic realities test in applying remedial social legislation but only where and to the extent appropriate. *See Doty v. Elias,* 733 F.2d 720 (10th Cir.1984).[28] We disagree with Main Hurdman's position that an economic realities test is categorically inapplicable to partnerships, but we also reject the form proposed by Wheeler and the EEOC as incomplete when applied to partnerships for several reasons.

The first difficulty with the many economic reality factors proffered to us is that they largely arise from cases involving alleged independent contractors.[29] The line-

---

applicable. However, for convenience we will use the hybrid test to analyze Ms. Wheeler's status under all three statutes inasmuch as the tests are not significantly different when applied to the facts of this case. A primary difference between the FLSA test and the hybrid approach taken under Title VII and the ADEA is that the FLSA test accords much less weight to an employer's lack of control over work performance. However, as discussed *infra,* in this case Ms. Wheeler's superiors at Main Hurdman controlled the significant aspects of her work. Brief of EEOC at 18 n. 14.

**28.** Even from the EEOC standpoint the economic realities test is not an overarching principle. The EEOC surely would not entertain the notion, for instance, that a corporate employee was *not* covered under the Acts even if a compelling set of facts revealed that the employee completely dominated the work environment and compensation within the corporation. Within the past year the Second Circuit rejected entreaties of a physicians' group to apply an economic realities test to their professional corporation, and reversed the district court which did. It held that the plaintiff/doctor, who in most accepted senses was only technically an

"employee" of the corporation, was an employee under the ADEA, stating that "use of the corporate form precludes any examination designed to determine whether the entity is in fact a partnership." *Hyland v. New Haven Radiology Assocs.,* 794 F.2d 793 (2nd Cir.1986). Addressing the type of factors urged here, the court said:

> NHRA urges us to "develop a ... list of factors to be considered in determining if an individual is a 'partner' or a covered 'employee.'" There is no need to develop such a list of factors where the individual involved is a corporate employee, for we hold that every such employee is "covered" for purposes of the ADEA and that any inquiry respecting partnership status would be irrelevant.

*Id.* at 798 (ellipses original).

**29.** The EEOC cites the following cases in support of its "hybrid" test which it urges us to adopt: *Spirides v. Reinhardt,* 613 F.2d 826 (D.C. Cir.1979) (further factual inquiry required to determine whether foreign language radio broadcaster was an employee or an independent contractor); *Garrett v. Phillips Mills, Inc.,* 721 F.2d 979 (4th Cir.1983) (salesman was independent contractor, not employee, under ADEA);

drawing exercise in those cases was between those who were really part of a business (employees) and those who were running a separate business (independent contractors). Factors employed for that purpose are useless for drawing lines between people who are part of the same enterprise. For example, in *Doty* we stated that: "The focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service ... or is, as a matter of economic fact, in business for himself." 733 F.2d at 722–23. Such an inquiry fails as a means of distinguishing among partners. Every general partner, at least in professional partnerships, is "dependent on the business," and does not pretend to be "in business for himself." *Id.* Yet, such an inquiry is the central theme of virtually every "economic realities" case cited. Similarly unhelpful factors include: whether the employer "furnishes the equipment used and the place of work," "length of time during which the individual has worked," and, payment by time or "by the job," *Spirides*, 613 F.2d at 832. It is also irrelevant in a partnership context to inquire whether the occupation requires skill, *id.* Any professional partner would be considered skilled under any circumstance. Inquiries into annual leave and retirement benefits, *id.*, are also inapplicable since such matters could include all general partners. In short, the specific independent contractor/employee factors cited to us are largely useless in a general partnership context.

The second difficulty with the proffered tests is that they purport to, but in fact do not, encompass reasonable limits. We are assured that these tests would not result in every partner falling under the Acts.[30] Brief of Plaintiff/Appellee at 14. Size is suggested to be an underlying criterion, presumably because according to Wheeler,

*EEOC v. Zippo Manufacturing Co.,* 713 F.2d 32 (3rd Cir.1983) (salesmen were independent contractors, not employees under ADEA); *Cobb v. Sun Papers, Inc.,* 673 F.2d 337 (11th Cir.) (janitor/custodian was independent contractor, not employee, under Title VII), *cert. denied,* 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982); *Unger v. Consolidated Foods Corp.,* 657 F.2d 909 (7th Cir.1981) (salesman was employee, not independent contractor under Title VII), *vacated on other grounds,* 456 U.S. 1002, 102 S.Ct. 2288, 73 L.Ed.2d 1297 (1982); *Lutcher v. Musicians Local 47,* 633 F.2d 880 (9th Cir.1980) (musicians were independent contractors, not employees, under Title VII).

Similarly with respect to cases cited by the EEOC as supporting a pure economic realities test under Title VII: *Armbruster v. Quinn,* 711 F.2d 1332 (6th Cir.1983) (manufacturer's representative was employee, not independent contractor, under Title VII); and under FLSA: *Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (fact situation involved purported members of cooperative as employees, but decision covered underlying independent contractor controversy); *Doty v. Elias,* 733 F.2d 720 (10th Cir.1984) (waiters and waitresses were employees, not independent contractors, under Title VII); *Donovan v. DialAmerica Marketing, Inc.,* 757 F.2d 1376 (3rd Cir.) (home researchers for a telephone soliciting organization found to be employees, not independent contractors), *cert. denied,* 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985); *Carter v. Dutchess Community College,* 735 F.2d 8 (2nd Cir.1984) (prison inmates working as teaching assistants in college courses offered at prison may qualify as employees); *Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465 (9th Cir.1983) (domestic "chore workers" were employees of state and county governments); *Dunlop v. Carriage Carpet Co.,* 548 F.2d 139 (6th Cir.1977) (voluntarily separated former employee considered an employee under FLSA); *Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308 (5th Cir.) (operators of laundry pick-up stations were employees not independent contractors), *cert. denied,* 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976); *Mednick v. Albert Enterprises, Inc.,* 508 F.2d 297 (5th Cir.1975) (hotel cardroom operator was an employee not an independent contractor). Wheeler's cases involving reliance on early Supreme Court cases are to the same effect. *See NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (newsboys were employees not independent contractors under the NLRA); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (slaughterhouse workers were employees under the FLSA); *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) (truck drivers and unloaders of coal were employees not independent contractors).

**30.** Wheeler and the EEOC attempt to distinguish *Burke v. Friedman,* 556 F.2d 867 (7th Cir.1977), and *EEOC v. Dowd,* 736 F.2d 1177 (7th Cir. 1984), for instance, on the ground that there were just a few partners in each partnership and that, therefore, all were active participants in managing their own affairs. There is not the slightest evidence in those cases that such participation was the fact.

"[b]eing a 'partner' in a four partner firm is significantly different than being a 'partner' in a 500+ partner firm. The economic realities are markedly different." *Id.*[31] That is not necessarily so. The heart of the standard proposed to us is a theory that any individual who is organizationally or economically dominated is an employee. In applying the domination theory to partnerships, there is an underlying assumption by its proponents that a "true" general partnership operates like a New England town meeting; that "true" general partners are not employees because they personally control management of the business and their own affairs within the business; that "true" general partners are not "dominated;" they are not controlled; they enjoy equality of bargaining power. Presumably, a "true" partner is not only heard at partnership meetings but actually controls the result as it affects that partner.

With due respect, those arguments and assumptions are not likely to translate to the real world with any discernible limits. Partnerships, as Justice Powell so aptly stated in his concurring opinion in *Hishon*, embody very special relationships and sensitive management concerns *inter se;* however, de facto "domination" or "control" of work, clients, billings, and compensation by key partners may be more common than not, and size of the partnership is not necessarily the determinative factor. Indeed, large partnerships may operate more democratically overall than small partnerships, which are frequently vulnerable to domination by a single partner or a small group of partners. "Domination" of a partner in assignment and supervision of work, billing, share of profits, and other matters can result from a myriad of wholly practical reasons existing from time to time in any partnership. Furthermore, a certain amount of "domination" may flow from the necessity of an organizational structure even in the smallest partnership. When the EEOC asserts that status depends upon the "individual's ability *actually to control* factors such as the management of the firm and critical elements of his or her work," Brief of the EEOC at 25 (emphasis added), we must wonder just how many partners the "actual control" requirement describes in the real world, and if *any* partnership of any duration would not have employee partners. What the EEOC and Wheeler are describing as true partners are sole proprietors and a limited number of dominant partners nationwide.

Thus, as stated, there is no way of applying the "domination" standard of reality urged upon us without including virtually every partnership in the United States,[32] with the burden shifting to the partnerships to prove some sort of parity of influence and day-to-day independence between and among the partners, free of "control" by the partnership as a whole. Perhaps, proponents would see this as unobjectionable, and a wholly appropriate interpretation and application of the Acts, but such wholesale application is not the way this case was argued.

Indeed, inequality of bargaining power, the dominant ability to perpetuate or termi-

**31.** One writer classifies "very large firms" as "those with twenty or more partners." Note, *The Age Discrimination in Employment Act and Mandatory Retirement of Law Firm Partners,* 53 S.Cal.L.Rev. 1679, 1704 (1980).

**32.** The fifteen and twenty covered person minimum, respectively, under Title VII and the ADEA, would implicate even a two-person partnership with fourteen, or nineteen, staff personnel. Furthermore, as pointed out by one commentator:

The issue of whether partners are counted as employees under Title VII is important in light of the fact that many state civil rights statutes often have lower jurisdictional requirements than Title VII. Most state civil rights statutes encompass the protections of Title VII, and many also prohibit discrimination on the basis of age and handicap.

The footnote supporting that text states:

Of the states constituting the Tenth Circuit, Colorado, Kansas, New Mexico, and Wyoming have statutes prohibiting discrimination by employers with fewer than fifteen employees. *See* Colo.Rev.Stat. § 24–34–401(3) (two or more employees); Kan.Stat.Ann. § 44–1002(b) (four or more employees); N.M.Stat. Ann. § 28–1–2(B) (four or more employees); Wyo.Stat. § 27–9–102 (two or more employees).

Newcom, *Hishon v. King & Spaulding: Discrimination in Professional Partnerships,* 62 Den.U.L. Rev. 2, 485, 492 (1985) (other footnote omitted).

nate a business relationship and otherwise to dictate terms, probably characterizes most dealings between large corporations and independent contractors. Yet, no one has yet suggested that de facto economic domination alone is enough to constitute the standard for defining all such independent contractors as employees—even though actual discrimination may occur.

The "realities" factors present yet another set of problems when applied to partners. Partner status is supported by agreement—written, oral, or implied—and statutes. Thus, "domination" of a partner may consist not of an absence of rights, as with an independent contractor, but of an abdication of rights, which may or may not be a temporary submissiveness. Accusations of de facto "control" of an individual will be met, as here, with recitations of legal rights. Breach of contract may have to be established before true "control" can be established.

Further, the status of partner is permanent while the envisioned "employee" status is a transient overlay. In the independent contractor cases the essential question was whether or not an individual was part of an enterprise (an employee) or running a separate enterprise. There is no such dividing line here. A potentially chaotic situation is presented with partners drifting into and out of covered "employee" status, remaining partners all the while, with no one ever quite knowing who is an employee/partner and who is a "pure" partner. The situation is rendered even more confusing when, as here, the complaint runs more to a regional office of the partnership than to the partnership and its governing agreement. Thus, because of an autocratic partner in charge of an office, the partners may be employees until the local partner is changed; but in other offices of the partnership, the partners with a less autocratic administrative partner are not employees. The EEOC and Wheeler depart entirely from any consideration of a legal or contractual right to control or share in control and look at drifting expressions of autocracy or democracy from place to place and person to person.

The central problem with the approach by Wheeler and the EEOC, however, is that it either ignores or relegates to insignificance the economic reality of partnership status itself. We view that as a fatal flaw. Status as a general partner carries important economic reality as well. Employees do not assume the risks of loss and liabilities of their employers; partners do. It is no small thing to be exposed to unlimited liability, to be personally at risk for a partner's mistakes, and to have one's share of profits always potentially conditional upon the outcome of claims, suits, and obligations generated by another partner. Partnership size, such as Main Hurdman's, guarantees no safety from liability. Nor does insurance. Numerous partners multiply risk. Firm size also makes a tempting litigation target. Large firms deal with large clients and with transactions and engagements involving enormous sums of money. Risk and potential liability are proportional. It is not unusual to see prayers of complaints in the hundreds of millions of dollars, especially in cases of spectacular business failures. Settlements of suits over one matter can run into the tens of millions of dollars. Even if the partnership is viewed as an entity separate from the partners for some purposes, it cannot shield the partners from risk, including liabilities arising from suits by other partners. There is simply no equivalent to unlimited liability in *any* case dealing with the definition of employee, nor is there any equivalent in any understood definition of the term.

Other common characteristics of partnerships are profit sharing; contributions to capital; part ownership of partnership assets, including a share of assets in dissolution of the enterprise; and the right to share in management subject to agreement among the partners.[33] These are economic realities, and no definition of "employee" is co-extensive. Additionally, as previously indicated, an entirely different body of statutes and case law applies to partners and

33. UPA §§ 6, 9, 15 and 18(a), (e).

partnerships, conferring rights and imposing obligations wholly foreign to, for instance, a corporate employee. When individuals combine to carry on business as partners all these factors introduce complexities and economic realities which are not consonant with employee status.

This conclusion is not inconsistent with the various cases cited by Wheeler and the EEOC, including the Supreme Court decision in *Goldberg v. Whitaker*, relied upon by the district court. The homeworkers in *Goldberg*, for example, bore no risk of liability or risk of loss of the business, or real opportunity to share in the profits of the business;[34] nor did the foreign language broadcaster in *Spirides*, the janitor in *Cobb*, or the plaintiffs in any of the other cited cases. *See supra* note 29. Nor did any of those plaintiffs enjoy the substantive economic and legal rights enjoyed by partners with respect to their businesses, including rights possessed by Wheeler in this case. Of the five factors listed by us in *Doty*, two (opportunity for profit and loss, and investment in the business) are regarded as inconsistent with employee status, and are fundamental to partnerships.

All of the foregoing reasons are answers to the declaration by the EEOC that "there is no rational basis for treating a partner differently than any other working individual." Brief of the EEOC at 22. There, of course, is a rational basis, as explained above.

In summary, while we do not reject invocation of any economic realities test in this case, we reject as incomplete the version used by Wheeler and the EEOC. That version itself fails to reflect economic reality.

4. *Limitations on Remedial Goals of the Legislation.*

As we stated at the outset, this is a case of statutory interpretation. There are statutory limitations to the argument that the remedial ends of the Acts justify as means any definition of employee which results in coverage. The underlying theme of the Wheeler/EEOC arguments is that discrimination itself defines the application of the Acts. Thus, all partnerships must be under the Acts. A "pure" partner is one who has enough power to avoid or defeat any act of discrimination. Any partner who can be discriminated against is, ipso facto, an employee. The problem with that reasoning is that it must include independent contractors and every other business relationship as well. If Congress had intended the Acts to apply to the performance of all services, subject to stated exceptions, it would have said so. To suggest that Congress intended the provisions of Title VII, the ADEA, and the FLSA to reach all situations where discrimination may arise in a business setting is to suggest that it enacted these statutes with the intent that they cover all individuals having an economic relationship with a business. This would make employee status largely irrelevant and would essentially transform the employment discrimination statutes into *business* discrimination statutes. *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir.1983). If this were the case, then we must question why Congress bothered to

---

**34.** There are many additional distinctions between *Goldberg* and this case. *Goldberg* dealt with a cooperative. Cooperatives are typically viewed as a form of corporate organization; their existence is dependent upon state cooperative incorporation laws or general incorporation laws. *See* I. Packel, *The Organization and Operation of Cooperatives* § 9 (4th ed. 1970). They are typically referred to as "cooperative corporations." *See* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 68 (rev. perm. ed. 1983) [hereinafter "Fletcher"]; 1A Fletcher § 109 (rev. perm. ed. 1983); 16A Fletcher §§ 3285, 3286 (rev. perm. ed. 1979). Further, "[a] cooperative incorporated under a cooperative statute is still a corporation and, as such, is affected by statutes that are applicable to corporations in general." I. Packel, *The Organization and Operation of Cooperatives* § 6(b)(3) at 36 (footnotes omitted). A number of years before *Goldberg* came before the courts, the Administrator of the Wage and Hour Division of the U.S. Department of Labor stated that a cooperative is more like a corporation than a partnership and that generally members of a cooperative are employees of the cooperative for purposes of the FLSA. 1941 Wage & Hour Manual at 58 (quoted in *Mitchell v. Whitaker House Coop.*, 275 F.2d 362, 365 n. 1 (1st Cir.1960), *rev'd sub nom, Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)).

limit each statute's reach to employment practices. The requirement that the statutes cover only employment situations suggests that Congress perceived a need to limit the application of these statutes. *Id.; see also Hishon v. King & Spaulding*, 467 U.S. 69, 79, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984) (Powell, J., concurring).[35]

The word "employee," however broadly defined, is still "employee," and circumscribed by meanings reasonably related to that word. Drafters of the statute gave no indication that they were departing from the common discourse of the republic when fashioning a law to be understood by and applied to its citizens. In shaping the economic realities test, the Supreme Court made just that point in *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944):

> Congress, on the one hand, was not thinking solely of the immediate technical relation of employer and employee. It had in mind at least some other persons than those standing in the proximate legal relation of employee to the particular employer involved in the labor dispute. It cannot be taken, however, that the purpose was to include all other persons who may perform service for another or was to ignore entirely legal classifications made for other purposes. Congress had in mind a wider field than the narrow technical legal relation of "master and servant," as the common law had worked this out in all its variations, and at the same time a narrower one than the entire area of rendering service to others.

*Id.* at 124, 64 S.Ct. at 857 (footnote omitted).

Such reasoning and authority answer the argument that Congress did not specifically exempt partners in the Acts, but did so with other groups [36] and, therefore, partners must be covered. Use of "employee" instead of a broader designation provides its own exclusion of bona fide general partners.

### D. *Summary.*

There may be many aspects of a partner's work environment in a partnership which are indistinguishable from that of a corporate employee. But in general the total bundle of partnership characteristics sufficiently differentiates between the two to remove general partners from the statutory term "employee." The case before us, which we regard as a "best case" presentation of the EEOC/Wheeler arguments, illustrates the point. Wheeler's circumstances as a partner are portrayed as indistinguishable from her prior employee status. Yet they are distinguishable, and substantially so. Her participation in profits and losses, exposure to liability, investment in the firm, partial ownership of firm assets, and her voting rights—plus her position under the partnership agreement and partnership laws—clearly placed her in a different economic and legal category. Evidence of that conclusion is found in the fact that only a small percentage of Main Hurdman personnel were admitted to the partnership. Similarly the characteristics of general partnership are different from that of a small, voting shareholder/director or officer of a large corporation.

For these reasons we reject both the "control" test and the economic realities test framed by Wheeler and the EEOC, for use in bona fide general partner situations. Such tests ignore or unacceptably diminish the essential attributes of partnership, as well as being incapable of rational application. We also reject the essential thrust of the Wheeler/EEOC position that susceptibility to discrimination defines coverage under the Acts. There is no statutory support for such a broad test.

---

**35.** Other statutes, apart from those involved in this case, may provide a remedy for discrimination in the business setting. For example, this court recently held that a black employee's claim of employment discrimination under 42 U.S.C. § 1981 was not preempted by Title VII. *See Meade v. Merchants Fast Motorline, Inc.*, 820 F.2d 1124 (10th Cir.1987). Claims under § 1981 or other statutes may not have the same statutory limitations that constrain us here.

**36.** Title VII and the ADEA contain certain exemptions for elected government officials and policymakers. *See* 42 U.S.C. § 2000e(f); 29 U.S.C. § 630(f); *see also* 29 U.S.C. § 631(c).

Our review of the statutes, the legislative hisory, agency position, the applicable cases, and the proferred tests leads inevitably to the conclusion that bona fide general partners are not employees under the Anti-discrimination Acts. If Congress amends the Acts to include partners it will be in a position through the hearing and debate process to fashion restrictions appropriate to partnerships. More importantly, by categorical inclusion or exclusion of partners Congress will allow administration of the Acts without resort to a case-by-case approach based on illogical, unsatisfactory types of tests such as those proposed here.

Pending examination of the question by Congress, partnerships do not remain free of the remedial effects of the Acts. The Supreme Court decision in *Hishon* requires a non-discriminatory open door to partnership consideration. Furthermore, partnerships obviously cannot without impunity admit one to the partnership merely as a device for avoiding application of the Acts, for then the bona fides of partnership status would be in question.[37]

## III.

### WHEELER'S CLAIM OF EMPLOYEE STATUS

There may be circumstances not fairly covered by our holding excluding bona fide general partners from coverage under the Acts. The bundle of partnership characteristics we have identified may be lacking in important particulars, or there may be some deception which compromises the actuality of those characteristics.[38] As Justice Powell noted: "an employer may not evade the strictures of Title VII simply by labeling its employees as 'partners.'" *Hishon*, 467 U.S. at 79 n. 2, 104 S.Ct. at 2236 n. 2. Those and similar circumstances expose the basic status of "bona fide general partner" to question and examination.

Wheeler pleads no such facts, and our examination of the complaint and Wheeler's affidavit reveals nothing which would avoid our holding as to partners generally. We conclude, therefore, that the district court erred in its decision that Wheeler was an employee of Main Hurdman at the time of the acts and events of which she complains.

## CONCLUSION

We have considered all of the arguments raised by Wheeler and the EEOC, and consider them insufficient to sustain the ruling by the district court. For the reasons stated above, we hold that bona fide general partners are not employees under the Anti-discrimination Acts. We also hold that Wheeler, as an acknowledged general partner of Main Hurdman, was not covered by the Acts and that the district court erred in its ruling that she was. The decision of the district court is REVERSED and the case REMANDED to the district court with instructions to enter judgment in favor of Main Hurdman, dismissing the complaint.

**37.** It is argued that the Acts would have no meaning if they cover consideration for partnership but can be ignored after partnership. In *Hishon* the Supreme Court said: "It is also of no consequence that employment as an associate necessarily ends when an associate becomes a partner." 467 U.S. at 69, 104 S.Ct. at 2229. *See also Golden State Bottling Co., Inc. v. NLRB,* 414 U.S. 168, 188, 94 S.Ct. 414, 427, 38 L.Ed.2d 388 (1973):

It is undisputed that when [the employee] was discriminatorily discharged he was an ordinary employee. The Act's remedies are not thwarted by the fact that an employee who is within the Act's protections when the discrimination occurs would have been promoted or

transferred to a position not covered by the Act if he had not been discriminated against.

**38.** For example, when the FLSA was originally enacted in 1938, some employers reorganized all of their employees into cooperatives or partnerships in an attempt to avoid compliance with FLSA provisions. *See, e.g., Mitchell v. Whitaker House Coop.,* 170 F.Supp. 743 (D.Maine 1959), *aff'd,* 275 F.2d 362 (1st Cir.1960), *rev'd sub nom, Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (cooperative); *Walling v. Plymouth Mfg. Co.,* 46 F.Supp. 433 (N.D.Ind.1942), *aff'd,* 139 F.2d 178 (7th Cir. 1943) (partnership); *Fleming v. Palmer,* 123 F.2d 749 (1st Cir.1941) (cooperative).