Orlando **GODOY**, et al., Plaintiffs,

v.

**RESTAURANT OPPORTUNITY CENTER OF NEW YORK, INC., et al., Defendants.**

No. 07 Civ. 7287 (DAB).

United States District Court, S.D. New York.

May 1, 2009.

Arthur Z. Schwartz, Schwartz, Lichten & Bright, P.C., New York, NY, for Plaintiffs.

Daniel E. Clifton, Lewis, Clifton & Nikolaidis, P.C., New York, NY, for Defendants.

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, District Judge.

Plaintiffs Orlando Godoy, Nereyda Pena, Augustina Pichardo, Veronica Azzalini, Behzad Pasdar, Jaime Alvarez, Jair Salinas, and Seeta Royha ("Plaintiffs"), bring suit against Defendants Restaurant Opportunity Center of New York, Inc. ("ROC–NY"), 417 Restaurant LLC a/k/a ROC N.Y. Restaurant LLC d/b/a Colors, ROC–NY Worker Owner Restaurant, LLC a/k/a RWOR, Saru Jayaraman, and Grace Gilbert, as President of ROC–NY ("Defendants"), alleging breach of contract, fraud, and violations of the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), and New York State Labor Law. Plaintiffs, former restaurant workers and members of Defendant not-for-profit corporation ROC–NY, allege that Defendants broke their agreement with Plaintiffs that Plaintiffs would gain equity in and employment at the "worker-owned" restaurant they helped ROC–NY to create in exchange for the hundreds of hours that Plaintiffs contributed to that effort. Plaintiffs seek through this action damages and injunctive relief in the form of their promised shareholder status in and employment at the restaurant, now known as "Colors," back pay for the work they performed on

behalf of ROC–NY during the period of 2002–2005 and the wages they did not earn because they were not employed at the restaurant once it opened, and costs and attorneys' fees in prosecuting this action. Defendants have moved to dismiss Plaintiffs' First Amended Complaint in its entirety, pursuant to Fed.R.Civ.P. 12(b)(6).

For the reasons set forth below, Defendants' Motion to Dismiss is GRANTED.

## I. BACKGROUND

The facts alleged in the First Amended Complaint in 07 Civ. 7287 (DAB) are assumed to be true for the purposes of this motion.

Plaintiffs Godoy, Pena, Pichardo, Azzalini, Pasdar, Alvarez, Salinas, and Royha are former restaurant workers and members of Defendant Restaurant Opportunity Center of New York ("ROC–NY"), a not-for-profit corporation founded in 2002 to advocate on behalf of restaurant workers in New York City. (Am. Compl. ¶¶ 3–4 & 11) Plaintiffs Godoy, Pena, Pichardo, and Azzalini were, prior to September 11, 2001, employees of Windows on the World, a restaurant then located on the 106th and 107th floors of One World Trade Center, in lower Manhattan. (Id. ¶ 3) Plaintiffs Pasdar, Alvarez, Salinas, and Royha were employed at other restaurants that joined ROC–NY in around 2002 and 2003. (Id.)

After September 11, 2001, Local 100, Hotel and Restaurant Employees Union ("HERE") established a relief fund (the "HERE Fund") for the 265 surviving and displaced workers from Windows on the World, 215 of which were HERE members, and their families. (Id. ¶¶ 9–10) The HERE Fund collected over $3 million in charitable contributions. (Id.) Defendant ROC–NY was created in April 2002, and initially helped to devise a needs-based assistance plan for the HERE Fund. (Id. ¶ 11) ROC–NY also provided training, financed by HERE, to enhance the skills of the displaced restaurant workers. (Id.) In around August 2003, the HERE Fund granted $112,627 to ROC–NY to support the former Windows on the World workers to create a cooperatively owned restaurant. (Id.) The new project was highly publicized, including articles in such publications as *The New York Times* and *People Magazine*. (Id. ¶ 15)

Plaintiffs Godoy, Pena, and Pichardo became members of Defendant ROC–NY in August 2002. (Id. ¶ 12) Several months later, ROC–NY began seeking grants to launch what was described as a "cooperatively owned restaurant" which would be run by-workers displaced after the September 11 terrorist attacks, and a "Cooperative Committee" of ROC–NY was created to direct that effort. (Id.) Plaintiffs Godoy, Pena, and Pichardo were initial members of the Cooperative Committee. (Id.) Plaintiffs Pasdar, Alvarez, and Azzalini joined ROC–NY and the Cooperative Committee in around 2003, and Plaintiff Salinas joined in around 2004. (Id. ¶ 13) All of the Plaintiffs joined the Cooperative Committee when they joined ROC–NY,[1] and many served on the Committee's Board of Directors at various times. (Id. ¶ 12)

Plaintiffs allege that, in creating the Cooperative Committee, Defendant Jayaraman told the members of ROC–NY, including Plaintiffs, that Cooperative Committee members would become owners of the new restaurant in return for doing 100 hours of work, which she described as "sweat equity," for the Committee. (Id. ¶ 14) Over the next two years, Plaintiffs allege that the hours required were increased, and Cooperative Committee

---

1. Plaintiffs do not indicate in their First Amended Complaint when Plaintiff Royha joined ROC–NY and the Cooperative Committee.

members, including Plaintiffs, "were asked to meet new 100 hour work requirements." (*Id.*) Throughout 2003 and 2004, members of the Cooperative Committee, including Plaintiffs, worked at fund-raising events doing catering, cooking, serving, set-up, clean-up, shopping, and driving. (*Id.* ¶ 16) All money raised at these events, including tips, went to ROC–NY. (*Id.*) Plaintiffs also attended conferences, met with consultants, organized, led, and participated in picket lines in front of restaurants that were alleged to be violating state and federal labor laws, met with politicians, and attended press conferences designed to publicize ROC–NY's efforts and plans to create the restaurant. (*Id.*) Members of the Cooperative Committee, including Plaintiffs, attended required, three-to-five hour weekly meetings, where they developed plans for the restaurant, fund-raising, publicity, and related matters. (*Id.*) Plaintiffs allege that they performed all of this work "without pay based upon the continuing representations by ROC–NY that their labor guaranteed them equity in the 'worker-owned restaurant' they were working to create, and would result in ongoing paid employment in this new restaurant." (*Id.*) Plaintiffs allege that Defendant ROC–NY described members of the Cooperative Committee as "worker-owners," and, in the organization's August 2004 liquor license application, as "co-owners." (*Id.*)

In late September 2004, Plaintiffs and other members of the ROC–NY Cooperative Committee were advised that there would be a mandatory meeting on October 4, 2004, and that failure to attend that meeting would result in expulsion from the list of cooperative owners of the restaurant. (*Id.* ¶ 18) At the October 4, 2004 meeting, Committee members were told that they had to sign a contract at that meeting or lose their membership in ROC–NY and the Cooperative Committee. (*Id.*

¶ 19) The contract required that each member work an additional three hours per week, and continue to perform unpaid labor for ROC–NY until the restaurant opened. (*Id.*) According to Plaintiffs, Committee members were prohibited from discussing the contract at the meeting, and members' efforts to postpone the mandatory signing deadline to another day were rebuffed by Defendants. (*Id.*) Plaintiff Godoy refused to sign the contract, and on December 13, 2004, was told that he would lose his Committee membership if he did not sign the contract by December 20, 2004. (*Id.* ¶ 20) Godoy again refused to sign the contract and, after explaining his position to the Board of the Cooperative Committee, was expelled from the Committee and ROC–NY on January 3, 2005 without further process. (*Id.*)

In about March 2005, "it began to become apparent" to Plaintiffs and other members of the Cooperative Committee "that, in fact, ROC–NY's plan for Cooperative' worker-ownership was not what ROC–NY and Jayaraman had represented it to be." (*Id.* ¶ 24) ROC–NY had decided to constitute itself as the sole member of the worker's ownership corporation, and at the start of the business, fifty (50) percent of restaurant stock would be owned by ROC–NY, and the other fifty (50) percent by the Cooperativa Italiana di Ristorazione ("CIR"), an Italian cooperatively owned restaurant group that had invested $1 million in the venture. (*Id.* ¶¶ 15 & 24) Twenty percent of restaurant stock would be transferred to the Cooperative Corporation, Defendant RWOR, at some future, undetermined date. (*Id.* ¶ 24) Plaintiffs Pasdar and Pena, as members of the Cooperative Committee Board, openly questioned whether what was being created was a "worker-owned" entity, and whether they had been misled. (*Id.* ¶ 25) Attempting to challenge ROC–NY's plan, four of the six Board members, including Pasdar

and Pena, drew up a list of demands, which was quickly signed by 15 of the 22 active Cooperative Committee members. (*Id.* ¶ 25) The dissenting members handed their demands to Defendant Jayaraman, then retained counsel, who attempted to negotiate with ROC–NY over the terms of worker-ownership. (*Id.* ¶ 26) On or about April 25, 2005, ROC–NY engaged a mediator, whom it had chosen without input from the dissenting members. (*Id.*) When the dissenters attempted to bring their attorney to the mediation, the mediator cancelled the meeting, and convened a meeting with Committee members not allied with Plaintiffs Pasdar and Pena. (*Id.*) When Pasdar and allied members attempted to enter that meeting, the mediator blocked the door, and adjourned the meeting. (*Id.*)

On May 7, 2005, Plaintiff Pasdar received a letter from Defendant Gilbert, as President of ROC–NY, advising Plaintiff that on May 11, 2005, the ROC–NY Board would vote about whether to terminate his membership in ROC–NY based on "allegations of aggressive and violent behavior toward members, staff, and consultants of ROC–NY." (*Id.* ¶ 27) However counsel for Pasdar requested that Pasdar have a fair hearing, (*id.* ¶ 28) Pasdar was allowed only an opportunity to speak prior to the Board's vote, and was not permitted to be present for the statements made against him. (*Id.* ¶¶ 27 & 29) The Board voted to expel Pasdar from ROC–NY and the Cooperative Committee. (*Id.*) At the same meeting, the Board adopted a number of resolutions affirming the structure of the "cooperative" restaurant to which the dissenters had objected. (*Id.*) After the

meeting, ROC–NY began to hold mandatory meetings not provided for in its Bylaws, including, Plaintiffs allege, one-on-one, "intimidating" meetings between Cooperative Committee members and ROC–NY's leadership and paid staff. (*Id.* ¶ 30)

Plaintiffs allege that as a result of the "intimidating" actions by ROC–NY, and the sense that they had been misled, many Cooperative Committee members, including Plaintiffs, stopped coming to meetings, and soon had their membership in the Cooperative Committee terminated without process. (*Id.* ¶ 31) These workers were not included in the initial group of "worker-owners" announced by ROC–NY in around August 2005. (*Id.*) In or around December 2005, when ROC–NY opened the restaurant, "Colors," none of the Plaintiffs, and no more than 10–12 of the Cooperative Committee members that had contributed the required sweat equity were included as "owners" and present as part of the restaurant's opening day staff. (*Id.* ¶ 32) None of the employees who were present and working at Colors actually had any equity in the restaurant at that time. (*Id.*) Plaintiffs never received their promised ownership interest or any other compensation for the work they performed for ROC–NY. (*Id.* ¶ 33)

Plaintiffs filed suit against Defendants[2] in the Supreme Court of the State of New York on July 24, 2007, and the case was removed to this Court on August 15, 2007. Plaintiffs filed their First Amended Complaint on September 6, 2007, alleging breach of contract, fraud, and violations of the federal Fair Labor Standards Act (the "FLSA") and New York State Labor Law.

---

**2.** Plaintiffs allege that Defendant 417 Restaurant LLC is a corporation which is owned in large part by ROC–NY and which operates a restaurant doing business as "Colors." (Am. Compl. ¶ 5) Plaintiffs allege that, upon information and belief, Defendant ROC–NY Worker Owner Restaurant LLC ("RWOR") is

a wholly owned subsidiary of ROC–NY which grew out of and was created by the Cooperative Committee of ROC–NY, and which was or is to be the vehicle through which employees of 417 Restaurant LLC are to exercise their ownership interest in the restaurant. (*Id.* ¶ 6)

Defendants moved to dismiss the First Amended Complaint on October 12, 2007. The motion was fully briefed as of February 22, 2008.

## II. DISCUSSION

### 1. *Legal Standard*

■ For a complaint to survive dismissal under Rule 12(b)(6) the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). In other words, a plaintiff must satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir.2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1964–65 (internal quotation marks omitted). In deciding a motion to dismiss, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir.2007) (citation omitted). However, "general, conclusory allegations need not be credited ... when they are belied by more specific allegations of the complaint." *Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany*, 2007 WL 2822214, at *7 (S.D.N.Y. 2007).

In ruling on a 12(b)(6) motion, a court may consider the complaint as well as "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." *Zdenek Marek v. Old Navy (Apparel) Inc.*, 348 F.Supp.2d 275, 279 (S.D.N.Y.2004) (citing *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001) (internal quotations omitted)).

### 2. *FLSA Claims*

Defendants argue that Plaintiffs have no claims against them under the Fair Labor Standards Act (the "FLSA") because ROC–NY was not an "enterprise engaged in commerce or in the production of goods for commerce" at any time relevant to this action, and because Plaintiffs were not "employees" of ROC–NY. (Defendants' Memorandum of Law in Support of Their Motion to Dismiss the First Amended Complaint at 2) Defendants submit that Plaintiffs' work for not-for-profit corporation ROC–NY was performed in furtherance of that organization's aims—to support restaurant workers and plan a new cooperative restaurant—and was not performed for a "business purpose," as required to make a claim under the FLSA. (Defs.' Memo of Law at 17) Defendants argue that Plaintiffs were *members*, not employees, of ROC–NY, and that Plaintiffs performed their hours of "sweat equity" for ROC–NY with no expectation of compensation, but as part of a contractual bargain that Plaintiffs ultimately failed to fulfill. (*Id.*) Plaintiffs counter that at all times relevant to this action, ROC–NY was in fact an "enterprise engaged in commerce or in the production of goods for commerce," engaged in the development and launch of a new business. Further, Plaintiffs argue, the hundreds of hours of "sweat equity" that Plaintiffs poured into this effort for ROC–NY constitute "employment" with that enterprise, as that term is understood under the FLSA. (Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss at 19 & 21)

■ The United States Supreme Court "has consistently construed [the

FLSA] liberally to apply the furthest reaches consistent with congressional direction, recognizing that broad coverage is essential to accomplish the goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency." *Tony and Susan Alamo Found. v. Sec. of Labor,* 471 U.S. 290, 296, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (internal citations and quotations omitted). The Act "contains no express or implied exception for commercial activities conducted by religious or other nonprofit organizations, and the agency charged with its enforcement has consistently interpreted the statute to reach such businesses." *Alamo,* 471 U.S. at 296–97, 105 S.Ct. 1953. In order for a nonprofit organization's commercial activities to be subject to the FLSA, two conditions must be satisfied: "[f]irst, the [organization's] businesses must constitute an '[e]nterprise engaged in commerce or in the production of goods for commerce'" and "[s]econd, the associates must be 'employees' within the meaning of the Act." *Id.* at 295, 105 S.Ct. 1953 (quoting 29 U.S.C. § 203(s)). Because, for reasons set forth below, the Court finds that Plaintiffs were engaged in a contractual exchange for equity ownership, and were not, as such, employees of Defendants as contemplated by the FLSA, the Court does not reach the question of whether ROC–NY constituted an "enterprise engaged in commerce or in the production of goods for commerce" for purposes of FLSA coverage.

The FLSA "contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to th[e] Act, were not deemed to fall within an employer-employee category." *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (internal quotation marks omitted). The Act defines "employee" broadly as "any individu-al employed by an employer," 29 U.S.C. § 203(e)(1), and "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). The FLSA's definition of "employee" "is necessarily a broad one in accordance with the remedial purposes of the Act." *Brock v. Superior Care Inc.,* 840 F.2d 1054, 1058 (2d Cir.1988) (citing *United States v. Rosenwasser,* 323 U.S. 360, 362, 65 S.Ct. 295, 89 L.Ed. 301 (1945)). The "striking breadth" of the definition of "employ," further, "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law purposes." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992).

■ Given the aims of the FLSA, the Supreme Court has directed that the question of whether an employee-employer relationship exists for purposes of the Act is one of "economic reality." *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (citing *U.S. v. Silk,* 331 U.S. 704, 713, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); *Rutherford Food Corp.,* 331 U.S. at 729, 67 S.Ct. 1473); *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947). In assessing the "economic reality" of a particular situation, courts have generally applied a five-part test drawn from factors articulated by the Supreme Court in *Silk,* 331 U.S. at 716, 67 S.Ct. 1463, and intended to distinguish employees from independent contractors. *See Superior Care,* 840 F.2d at 1058. Specifically, courts have considered: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the

extent to which the work is an integral part of the employer's business." *See, e.g., id.* at 1058–59; *Wheeler v. Hurdman,* 825 F.2d 257, 271 (10th Cir.1987); *Brock v. Mr. W. Fireworks, Inc.,* 814 F.2d 1042, 1043 (5th Cir.1987). However, the "economic reality" of a situation depends not upon "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp.,* 331 U.S. at 730 67 S.Ct. 1473. "No one of the[ ] factors is dispositive; rather, the test is based on a totality of the circumstances," and "[t]he factors that have been identified by various courts in applying the economic reality test are not exclusive .... any relevant evidence may be considered, and mechanical application of the test is to be avoided." *Superior Care,* 840 F.2d at 1059. As such, employment under the FLSA is "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances," *Barfield v. New York City Health and Hospitals Corp.,* 537 F.3d 132, 141–42 (2d Cir.2008).[3]

Whatever factors are incorporated and considered, "[t]he ultimate concern" of a court's "economic reality" inquiry is the economic dependence of the putative employee on the putative employer; that is "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Superior Care,* 840 F.2d at 1059; *see also Doty v. Elias,* 733 F.2d 720 (10th Cir.1984) ("The focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service ... or is, as a matter of economic fact, in business for himself."); *Brock v. Mr. W. Fireworks, Inc.,* 814 F.2d at 1043 ("the 'economic dependence' of the putative employees [is] the touchstone for this totality of the circumstances test ... The five tests are aids-tools to be used to gauge the degree of dependence of the alleged employees on the business with which they are connected. It is dependence that indicates employee status.").

■ Having surveyed the various economic reality tests and factors applied by the courts, this Court finds lacking any

**3.** Given the case-by-case nature of the "economic reality" inquiry, the Second Circuit has identified and applied tests incorporating different sets of factors based upon the particular factual challenges presented by individual cases. *See Carter v. Dutchess Community College,* 735 F.2d 8, 12 (2d Cir.1984) (rejecting "ultimate control" as the determinant of employer status, and setting a four-factor test for employment: whether the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."); *Zheng v. Liberty Apparel Co.,* 355 F.3d 61, 72 (2d Cir.2003) (expanding upon the *Carter* factors to establish a six-factor test for employment based on "functional," rather than formal, control: "(1) whether [defendant's] premises and equipment were used for the plaintiffs' work; (2) whether the [putative joint employers] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the defendant]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [defendant] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the defendant]."); *Barfield,* 537 F.3d at 143 (collecting cases and concluding that "the various factors relied upon by this court ... state no rigid rule for the identification of an FLSA employer. To the contrary ... they provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA.") (internal citations omitted).

standard applicable to the question presented by the particular facts of this case—that is, whether workers laboring for and together with a not-for-profit corporation to develop a business that they would co-own are employees of that corporation for purposes of the FLSA. Instead, the Court finds company with the Tenth Circuit in its decision in *Wheeler v. Hurdman*, 825 F.2d 257 (10th Cir.1987). In that case, the Circuit considered whether a general partner of an accounting firm was an "employee" of that firm for purposes of a FLSA action. After reviewing the traditional "economic reality" factors employed by the courts, the Court noted the "absence ... of any coherent standard of 'economic reality' for supposed application to partners" in a business, and concluded that "the specific independent contractor/employee factors ... are largely useless in a general partnership context." *Id.* at 271–72. The Court explained that while "[t]he focal point in deciding whether an individual is an employee" under the "economic realities" jurisprudence, "is whether the individual is economically dependent on the business to which he renders service ... or is, as a matter of economic fact, in business for himself,"

> "[s]uch an inquiry, fails as a means of distinguishing among partners. Every general partner, at least in professional partnerships, is 'dependent on the business,' and does not pretend to be 'in business for himself.' ... Similarly unhelpful factors include whether the employer furnishes the equipment used and the place of work, length of time during which the individual has worked, and payment by the time or by the job. It is also irrelevant in the partnership context to inquire whether the occupation requires skill. Any professional partner would be considered skilled under any circumstance ..."

*Id.* at 272. The "central problem" with employing the "economic reality" framework used by the courts in the partnership context, the *Wheeler* court concluded, is that "it either ignores or relegates to insignificance the economic reality of the partnership status itself." *Id.* at 274. The Court explained:

> "Status as a general partner carries important economic reality as well. Employees do not assume the risks of loss and liabilities of their employers; partners do.... Other common characteristics of partnerships are profit sharing; contributions to capital; part ownership of partnership assets, including a share of assets in dissolution of the enterprise; and the right to share in management subject to an agreement among the partners. These are economic realities, and no definition of 'employee' is co-extensive.... When individuals combine to carry on a business as partners all these factors introduce complexities and economic realities which are not consonant with employee status."

*Id.* at 274–75.

This Court, likewise, finds that the traditional "economic reality" tests for employment fail to capture the "economic reality" of the factual situation presented here: that is, workers laboring for and together with a not-for-profit corporation toward the co-ownership of a business. Given the equity agreement between Plaintiffs and Defendants, the Court finds that the relationship between the Parties in this case is closer to the partnership considered in *Wheeler* than it is to any of the putative employment relationships presented by cases that have utilized a traditional "economic reality" test. *See Barfield*, 537 F.3d 132 (hospital was joint employer of nurses paid by separate referral agencies); *Zheng*, 355 F.3d 61 (garment manufacturer had "functional control" over subcontractors hired to stitch and finish clothing); *Superior Care*, 840 F.2d 1054 (health care

agency was employer of nurses it referred out for various assignments); *Carter*, 735 F.2d 8 (community college could be employer of prison inmates conducting classes). While Plaintiffs were not, as yet, partners of the business they were working with Defendants to create, Plaintiffs devoted the hundreds of hours of work for which they now seek compensation under the FLSA in explicit exchange for co-ownership of the business. Specifically, Plaintiffs allege that, "[i]n creating ROC–NY's Cooperative Committee, defendant Jayaraman told plaintiffs, and the members of ROC–NY, that Cooperative Committee members would become owners of the new restaurant in return for doing a certain amount of work, which she described as 'sweat equity,' for the Committee. That number was set at 100 hours …" (Am. Compl. ¶ 14) Plaintiffs allege that "over the next two years, the hours required were increased as plaintiffs … were asked to meet new 100 hour work requirements," and they "performed this work with the understanding that it would gain them equity in this new restaurant and result in ongoing employment once the restaurant was in operation." (*Id.*) Parties' agreement that Plaintiffs would be co-owners of the restaurant was repeated many times orally and in writing. (*See id.* ¶ 16 (ROC–NY described members of the Cooperative Committee as "co-owners" in its August 2004 liquor license application); ¶ 17 ("In a December 4, 2004 letter to [investor Cooperativa Italiana di Ristorazione ("CIR")], ROC–NY advised CIR that members of the cooperative would earn equity in the RWOR "through sweat equity participation requirements" and that the "capital [of RWOR] will be sweat equity converted to cash equivalent in stock.")). Plaintiffs devoted many hours of work to the project "without pay based upon the continuing representations by ROC–NY that their labor guaranteed them equity in the 'worker-owned restaurant' they were working to create, and would result in ongoing paid employment in this new restaurant." (*Id.* ¶ 16)

Consideration of the factors used by the Tenth Circuit in *Wheeler* to assess the economic reality presented by a partnership supports the absence of an employer-employee relationship in this instance. *See Wheeler*, 825 F.2d at 274–75. Like partners at a firm, Plaintiffs, as putative co-owners of the business they were working to create, "assume[d] the risks of loss and liabilities" of the venture, and had a real opportunity to share in its profits upon success.[4] Plaintiffs' hours of "sweat-equity" represented their "capital" contribution to the business, (*see* Am. Compl. ¶ 17) and one that "would earn [Plaintiffs] equity in the RWOR" as "sweat equity converted to cash equivalent in stock." (*Id.*) While Plaintiffs' "right to share in management" once the restaurant opened is not specifically alleged in the Complaint, the Court notes that Plaintiffs were members of the Board of Directors of the Cooperative Committee tasked with the management of the restaurant's planning and development phase. (*See id.* ¶¶ 12–13 & 16) Taken together, the balance of these "economic realities" weighs against the existence of an employment relationship in this case. As Plaintiffs and Defendants were at all relevant times putative co-owners of the restaurant they were working to create, the Court finds that Plaintiffs were not, as a matter of economic reality, the employees of Defendants. As such, Plaintiffs have no claims under the FLSA, *see Alamo*, 471 U.S. at 296–97, 105

---

4. Like *Wheeler*, then, this case is readily distinguishable from *Goldberg v. Whitaker House Cooperative*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961). *See Wheeler*, 825 F.2d at 275.

S.Ct. 1953, and Defendants' Motion to Dismiss these claims is GRANTED.

## III.   CONCLUSION

Because the Court has dismissed Plaintiffs' sole federal claim, the Court has no original jurisdiction over this case. The Court, thus, does not address the Plaintiffs' remaining state law claims for breach of contract, fraud, and violations of the New York Labor Law. The Court dismisses Plaintiffs' claims without prejudice, and the Clerk of Court is directed to close the docket in this case.

SO ORDERED.